Filed 4/2/26  P. v. Herring CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RICO DESHAWNITY HERRING,<br><br>Defendant and Appellant. | F088117<br><br>(Super. Ct. No. BF193344A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted Rico Deshawnity Herring (appellant) of human trafficking of a minor (Pen. Code, § 236.1, subd. (c); count 1),[1] pandering of a minor 16 years of age or older (§ 266i, subd. (b)(1); count 2) and pimping of a minor 16 years of age or older (§ 266h, subd. (b)(1); count 3). As to count 1, the jury found true the allegation that the offense involved force, fear, or other coercive means. (§ 236.1, subd. (c)(2).) The trial court sentenced appellant to 15 years to life in state prison.

On appeal, appellant claims the trial court abused its discretion in admitting text message exchanges from his cell phone revealing acts of human trafficking and pandering of women other than L., the charged victim. He also contends the evidence was insufficient to sustain the jury's finding that count 1 involved force, fear, or other coercive means. We conclude that an abuse of discretion did not occur, and that the jury's finding was supported by substantial evidence. We affirm.

## BACKGROUND

### I.     L.'s Testimony.

In December 2022, L., who was then 16 years old, began communicating with appellant, a 31-year-old man, through an online dating application. At the time, L. was living with her grandmother in Bakersfield. L. testified that she was in the custody of the "DHS"[2] and had been placed with her grandmother because, in her words, "that's the only place that they know I ain't going to run."

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     L. appears to have been referring to the Kern County Department of Human Services.

2.

Appellant first contacted L. on December 5, 2022.[3]  Their communication quickly progressed from the dating application to numerous text messages and phone calls. Appellant invited L. to join him in Sacramento, telling her that they could "elevate together" and that "you a million dollar[,] [w]e can run it up."  L. agreed, explaining that appellant promised love and acceptance, which was what she was seeking at the time.

Appellant purchased L. a bus ticket and sent her a confirmation number.  On the evening of December 6, 2022, L. left her aunt's home telling her family she was going to her grandmother's house but instead walked to the bus station.  She boarded a bus bound for Sacramento and arrived early the next morning.  Appellant picked L. up at the bus station and drove her to a park, where they engaged in sexual intercourse in his car.

Within a few hours of her arrival, appellant told L. he wanted her to "bust dates," meaning to have sex with men in exchange for money.  L. testified she "went along with it" because she was in love with appellant and "was willing to do anything."  Appellant posted an advertisement on an escort service website with her photo and his phone number.  That evening, he drove her to Modesto to meet an individual who responded to the advertisement.[4]

L. testified that appellant became her "pimp," and over the next several weeks, she engaged in commercial sex acts at his direction.  Initially, appellant procured sex dates for L. through online advertisements.  Appellant arranged meetings with sex buyers, set the terms, and either transported L. to the agreed-upon location or provided her with the address.  After several days, appellant also made L. procure sex dates by working the "blade," an area described as one where "prostitutes walk and bust dates."  Appellant

---

**3**     L. testified that her communications with appellant began on December 6, 2022. Forensic analysis of appellant's phone, however, revealed text message correspondence with L. beginning on the evening of December 5, 2022.

**4**     L. testified with a grant of use immunity.

monitored L.'s activities by communicating with her via text message, waiting nearby while she completed sex dates, and observing her while she solicited buyers on the street.

Appellant exercised complete authority over L. during the time that he trafficked her. He set a daily quota of $500, typically requiring L. to complete seven to 10 sex dates. If L. did not meet the quota, appellant would force her to work longer, even in harsh weather. Appellant took all the money L. earned and searched her purse and person after she finished working to ensure she had surrendered all proceeds. Appellant was L.'s sole source of transportation, and she was permitted to eat only with his approval. As L. explained: "When you work for a pimp, you're basically their property. You're their money. You do what they say."

L. testified that appellant punished her when she was "out of pocket." She stated that while working for appellant, she was required to follow his directives and complete sex dates as instructed, and that any failure to comply resulted in being labeled "out of pocket" and punished accordingly. In such instances, appellant would threaten to harm or kill her or would physically assault her. When assaults occurred, appellant typically slapped her in the face with an open hand with enough force to leave her dazed. She recounted one incident in which she told appellant she was tired and did not want to work, after which appellant "got upset and beat the shit out of me." On another occasion, appellant punched her in the ribs with a closed fist. Appellant also threatened to hurt L.'s younger sister, which she explained was an effective way to manipulate her because she is protective of her sibling.

Appellant primarily trafficked L. in Sacramento but also transported her to other cities throughout California, including Santa Barbara, Los Angeles, Fresno, and San Bernardino. In each city, appellant arranged sex dates for L. through online advertisements and/or directed her to work on the blade.

L. testified that, while appellant was driving her from Los Angeles to Fresno, they got into an argument when L. discovered appellant was still romantically involved with

4.

the mother of his children. When L. attempted to call her grandmother, appellant threw L.'s phone out of the car and then struck her head against the window. L. became upset and punched the window, causing it to break.

After arriving in Fresno, appellant took L. to the blade. L. was worried appellant would abandon her, but she got out of the car because she did not want to cause additional problems. After L. completed a sex date and attempted to return to give appellant the money, she discovered that he had left. About a week later, appellant texted L. that he missed her and was going to come get her. L. agreed to rejoin him because she was scared and alone. He met her at a fast-food restaurant with his three young children, and they returned to Sacramento.

Later that month, during a drive to Los Angeles with the mother of his children, appellant and L. became involved in an argument. Appellant pulled into a parking lot, and L. attempted to flee. Appellant caught L. and struck her. The mother of appellant's children intervened, telling him to stop because others were observing. According to L., appellant slapped her hard enough to leave her feeling disoriented.

L. testified that she loved and cared about appellant and hoped that, after they got "past this business stuff," a genuine romantic relationship would develop. She later realized her feelings were not mutual and that appellant was interested only in her earning money for him. After appellant began hitting her, her continued compliance was motivated by fear rather than affection. She ultimately became fed up with the way appellant spoke to her, treated her, and abused her, and decided to leave him. In late December 2022, she called her foster parents, and they purchased a bus ticket for her to return to Bakersfield. She told appellant she was done, and he drove her to the bus station. After she left, appellant continued to call her and send her text messages, but they had no further in-person contact.

## II.    Arrest and Investigation.

Bakerfield Police Department Detective I. Jones, an expert in human trafficking, served as the lead investigator in appellant's case. On January 10, 2023, a Child Protective Services employee informed Jones that L. had reported she was recently trafficked. Jones met with L. in Bakersfield, where she provided him with her cell phone. The phone was submitted to a technician for forensic analysis and extraction of data.

Appellant was arrested at a motel in Sacramento on February 1, 2023. Arresting officers seized his cell phone, which was also submitted for forensic analysis and data extraction.

Jones reviewed text messages extracted from both phones, relevant portions of which were admitted into evidence. Appellant and L. began communicating on December 5, 2022. L. sent appellant a photo of herself and stated she was interested in him but concerned that he was still involved with the mother of his children. Appellant responded that he was "working on that," stated that the mother of his children was packing her belongings to leave, and told L. that he was very interested in her.

Appellant told L. that he did not have a job and instead "be trappin to get money," which Detective Jones explained referred to commercial sex exploitation. Appellant stated they were going to "get a bag together," that he wanted her to "be in my life after," and that he "see[s] us together forever no matter what." He promised L. a nice car, a "big bag," and anything else she wanted—promises Jones testified are commonly used by exploiters to induce victims to join them. Appellant also told L., "I just need you to play your part," which Jones opined meant L. would be expected to engage in sexual acts for money and give the proceeds to appellant.

The next day, appellant sent her a confirmation number and password for a bus ticket. L. confirmed that she was coming, sent appellant photos of the bus pass from Bakersfield to Sacramento, and regularly updated him on her location and status. Early in the morning on December 7, 2022, she messaged appellant, "I'm here."

Over the next several weeks, appellant and L. exchanged numerous text messages showing appellant's ongoing exploitation of L. Their communications included discussions about buyers and pricing; coordination of transportation to and from sex dates; updates from L. regarding sex dates she had procured and the amounts earned; and L. requesting additional condoms and wipes. Appellant regularly urged L. to engage in additional sex dates and secure higher paying dates, chastised her for not working hard enough or earning sufficient money, and indicated that he was watching or monitoring her while she worked. Appellant's cell phone also contained messages with sex buyers in which he coordinated the time and location of the date, prices, and the sex acts to be performed.

On one occasion, after L. told appellant she did not want to be with him, appellant responded, "I'm coming to get you," and "Bitch I'll kill u think u can leave me."[5]

Call detail records for appellant's cell phone, which reflected the phone's geographic location at specific dates and times, were consistent with L.'s testimony that he trafficked her to various cities throughout California. Detective Jones testified that he searched various online escort websites and located advertisements for L. that corresponded with appellant's location on particular dates. The advertisements included photographs of L., often in the nude or in provocative poses, and listed appellant's phone number.

On January 9, 2023, after L. had returned to Bakersfield, L. messaged appellant that she missed him, and appellant responded that if she came back, she would be "working the blade every day for 90 [days],", and would have to "do what the fuck I say for real."

---

[5]     It is unclear from the record when this text message exchange occurred.

## III.	Evidence of Uncharged Acts of Human Trafficking and Pandering.

Appellant's cell phone contained text messages with other apparent human trafficking victims, who did not testify at trial.  The messages were admitted pursuant to Evidence Code section 1101, subdivision (b).

On January 15, 2023, appellant messaged a woman identified as "Vanessa" and asked whether she had "folks."  Detective Jones explained that within the culture of commercial sexual exploitation, "folks" is another term for "a pimp."  Appellant sent a photo of himself, and stated, "I want to be in your life, baby.  Build something with you." Jones testified that appellant was "referring again to this concept of elevation ….  It's building this sort of fantasy world of making so much money through being commercially sexually exploited that our lives are going to be set."

On January 14, 2023, appellant exchanged messages with an unidentified woman. The woman sent photos of herself and told appellant that he contacted her in November, that she was not "interested" then but might be interested now, and that she is "tired of being used."  Appellant responded, "I'm always going to be here for you though, my love.  So if you ready, I am too."  According to Detective Jones, the woman appeared to be seeking a trafficker who would take care of her, and that appellant's messages reflected attempts to appeal to her vulnerabilities by offering love and affection if she decided to work for him.

Appellant had extensive communications with a woman identified as "Bri" spanning December 2022 and January 2023.  Appellant asked Bri to "trap" for him, and when she asked what he meant, he stated, "make money if guys give it to you," and "[t]hey would expect to do some things with you."  Bri responded that she had too much respect for herself to do "sex work for" him.

Despite her refusal, appellant continued to message Bri and press her to do commercial sex work.  Appellant informed her that he had two other women that were "making money" for him and that he wanted her to meet them.  When Bri told appellant

that she just wanted to "be with" him, he responded that her refusal to do sex work made him think she did not want to be together. As Bri continued to resist appellant's invitations to engage in sex work, appellant repeatedly expressed that their relationship could not continue unless she assented.

Eventually, Bri agreed to "do the web thing," and sent appellant photos for online advertisements. Appellant rejected her suggestion that they split her earnings, stating, "[Y]ou know you got to break yourself to me. That means pay me the money." He insisted that he loved her and was trying to build a stable financial future for the two of them. Later, although had she consistently refused to work on the blade, appellant continued to pressure her, eventually telling her, "[Y]ou gon' do what the fuck I said. I don't care." Jones explained that the messages with Bri showed appellant engaging in a "grooming process," offering the façade of love and leveraging the victim's feelings to slowly compel her to engage in commercial sex acts for his benefit.

Appellant exchanged numerous text messages with a woman identified as "Luv Bug" in late January 2023. Over the course of several days, she reported to appellant on the sex dates she arranged and completed, as well as the amounts of money earned, while he dictated how much she was expected to work and the number of dates she was to complete. They also exchanged expressions of love and affection, and she referred to appellant as "my king." On one occasion, she complained to appellant that he was not answering her calls and that she was "stranded and cold," adding: "I have no sleep, no feeling on my hands or fingers. I've been dedicated and learning and following your instructions. How you gonna abandon me like this?" Later, appellant asked her if she had been in touch with her mother, and they discussed what she should tell her about her whereabouts. At one point, she stated, "I ain't a good liar and I ain't telling her I got fucking pimped out and damn near kidnapped."

Appellant also exchanged text messages with a woman identified as "Snowbunny" in January 2023. She told appellant she was no longer working as a prostitute because

she was pregnant and due in two months.  Appellant responded, "You can work until then, though."

## IV.    Expert Testimony.

Detective Jones described the methods commonly used by traffickers to control victims, including visual surveillance, setting quotas, controlling access to basic necessities, and the use of physical violence when their directives are not followed.

Detective Jones explained that the grooming process typically begins with promises of love, affection, wealth, and a better life.  Once an attachment forms, the trafficker introduces the victim to commercial sex work and conditions the relationship and continued affection on participation in that work.  He testified that minors are particularly susceptible to trafficking due to their need for love and affection, especially those who are runaways or have experienced difficult upbringings.

Based on a hypothetical mirroring the evidence at trial, Detective Jones opined that a person in L.'s position had been coerced into engaging in commercial sex work. He explained that when a minor is isolated from family and dependent on a trafficker for affection and resources, and the trafficker conditions access to those things on participation in commercial sex work and threatens physical violence for noncompliance, the minor has no meaningful ability to refuse.

## V.    Appellant's Testimony.

Appellant testified he met L. through a dating application while seeking a long-term relationship, and that he believed she was 20 years old based on the age listed on the application.  His messages describing her as "a million dollars" and referencing earning money together were "corny line[s]" that he used to gain her affection.

Appellant claimed it was L.'s idea and choice to engage in commercial sex work. The topic arose after L. arrived in Sacramento and appellant did not have enough money to afford a motel room.  He denied forcing her to engage in sex dates, setting quotas, or profiting from her commercial sex work, insisting that all the money went to L. and "her

10.

expenses." He stated that he never placed his hands on L. or threatened her or her family, did not impose rules on their relationship, and that L. was always free to leave.

Appellant testified the messages with L. referencing specific amounts of money earned from sex dates were solely to ensure they had enough money to afford a motel room for the night or to pay for his broken car window. When asked to explain the text messages with apparent sex buyers, appellant stated that L. always had access to his cell phone. He claimed that the message threatening to kill her was sarcasm and taken out of context and was made when L. was back in Bakersfield and he was in Sacramento. With respect to the message that if she came back, she would have to work on the blade for 90 days, he stated he was only trying to get under her skin and persuade her not to return.

Appellant admitted that he left L. on the blade in Fresno because he "was going through a lot at that time" and could no longer "handle her." About one week later, he saw she was on the dating application, reached out to her, and drove down from Sacramento to pick her up at her request. At the end of December 2022, L. asked to go home, and appellant drove her to the bus station.

Appellant conceded that he asked Bri to "trap" for him and work on the blade, but insisted she was already involved in commercial sex work when they met, and he never forced her to do anything. Similarly, he testified that Luv Bug was already participating in commercial sex work when they met, and admitted providing transportation to and from sex dates, but denied encouraging her to participate in such work. He described himself as a "hopeless romantic" and claimed that he had "unconditional love" for L., Bri, and Luv Bug, and that it did not bother him that they were engaged in sex work.

## DISCUSSION

I.    **The Trial Court Did Not Abuse Its Discretion in Overruling Appellant's Evidence Code Section 352 Objection to the Uncharged Acts Evidence.**

Appellant challenges the trial court's admission of text message exchanges found on his phone with other women, which detailed uncharged acts of pandering and human

11.

trafficking.  He argues the evidence had minimal probative value, was unnecessarily voluminous and inflammatory, and created a substantial risk the jury would misuse it as impermissible character evidence.

A.    *Background.*

The People moved in limine to admit, pursuant to Evidence Code section 1101, subdivision (b), appellant's text messages with women other than L.  The messages showed appellant engaging in uncharged acts of human trafficking and pandering in December 2022 and January 2023.

The People asserted the messages were relevant to show appellant's intent to induce L. to engage in commercial sex acts, his knowledge of the business of sexual exploitation and its culture and language, and to undermine any claim by the defense that there was an innocent explanation for his communications with L.  Appellant objected that admission of the evidence would violate his rights to confrontation and due process, and that it should be excluded under Evidence Code section 352.

The trial court took the matter under submission and subsequently granted the People's motion.  It found the charged offenses and uncharged acts reflected in the text messages were sufficiently similar to support the inference that appellant harbored same the intent in each instance, reasoning that both "involved a commercial enterprise exploiting runaway minors and the human trafficking of minors."  The court explained that the text messages between L. and appellant must be placed in context to ascertain his intent, and that his messages with the uncharged victims were "tremendously probative on that point."  Additionally, the court ruled that the text messages were relevant to show appellant's knowledge of the "commercial enterprise" of human trafficking and exploitation.

The trial court also overruled appellant's Evidence Code section 352 objection, finding that the uncharged acts evidence was highly probative, no more inflammatory than the charged offenses, and could be introduced without a substantial expenditure of

time.  The court explained that it would instruct the jury that the evidence was admitted for a limited purpose, making jury confusion unlikely and mitigating the risk that the evidence would be considered for an improper character purpose.

When the text messages were admitted by the People, and again when appellant was asked about them on cross-examination, the trial court gave the following limiting instruction: "The evidence that you hear is not to be considered as showing [appellant's] bad character or disposition to commit crimes but only for the limited purpose of determining if it tends to show the intent which is a necessary element of the crimes charged in Count One and Two and inference that what [appellant] learned from prior experience provided the relevant knowledge in the current offenses"

At the close of trial, the trial court instructed the jury with CALCRIM No. 375 (Evidence of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.), which read, in pertinent part: "The People presented evidence that [appellant] committed the offenses of sex trafficking and pandering that were not charged in this case.  [¶] … [¶] … If you decide that [appellant] committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether: [¶] [Appellant] acted with the intent on Counts One and Two.  … [Appellant] knew how the business is organized and run as a business when he allegedly acted in this case in Counts One, Two, and Three.  [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offenses.  Do not consider this evidence for any other purpose.  Do not conclude … from the evidence that [appellant] has a bad character or is disposed to commit crime."

**B.**    ***Applicable law and standard of review.***

Evidence Code section 1101, subdivision (a), " 'prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667.)  Subdivision (b) of that section clarifies

13.

that evidence of uncharged misconduct may be admitted when it is " 'relevant to establish some fact other than the person's character or disposition.' " (*People v. Fuiava,* at p. 667.)  Such evidence "is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity." (*People v. Daniels* (1991) 52 Cal.3d 815, 856; see Evid. Code, § 1101, subd. (b).)

"When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant." (*People v. Daniels, supra,* 52 Cal.3d at p. 856.)  This includes an assessment under Evidence Code section 352 of whether the probative value of the uncharged misconduct evidence "is substantially outweighed by the probability that its admission will … create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, see *People v. Lewis* (2001) 25 Cal.4th 610, 637.)  Because this type of evidence can be so damaging, " '[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.' " (*People v. Daniels*, *supra*, 52 Cal.3d at p. 856.)

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)  "A ruling subject to this standard of review 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Pineda* (2022) 13 Cal.5th 186, 222.)

C.    *An abuse of discretion did not occur.*

Appellant does not dispute that admission of the uncharged acts evidence satisfied Evidence Code section 1101, subdivision (b)'s requirement that the evidence be "relevant

to prove a material fact other than [his] criminal disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) Instead, he contends that the evidence should have been excluded under Evidence Code section 352 because it was of limited probative value and so voluminous and inflammatory that it overwhelmed the jury's ability to refrain from drawing an improper propensity inference. Accordingly, we must determine whether the trial court abused its discretion in finding that the probative value of the uncharged acts evidence was not "substantially outweighed by the … danger of undue prejudice." (Evid. Code, § 352.)

We begin by considering the probative value of the uncharged acts evidence. Appellant's intent in his interactions with L. was an essential element of the charged offenses and a central issue for the jury. The charge of human trafficking of a minor (§ 236.1, subd. (c); count 1) required proof that appellant caused, induced, or persuaded L. to engage in commercial sex acts, and acted with the intent to commit or maintain a violation of section 266i (pandering) and/or 266h (pimping). (See CALCRIM No. 1244.) Likewise, the charge of pandering of a minor (§ 266i, subd. (b)(1); count 2) required proof that appellant "intended to influence [L.] to be a prostitute." (See CALCRIM No. 1151.) Thus, evidence bearing on appellant's intent to induce or persuade L. to engage in commercial sex work was necessarily relevant. (See *People v. Thompson* (1980) 27 Cal.3d 303, 315 [where a defendant has pleaded not guilty, elements of the crimes charged are disputed material facts].)

The text messages with uncharged victims showed appellant at various stages of attempting to induce, and in some instances successfully inducing, them to engage in commercial sex work for his benefit. As in his communications with L., appellant initially approached other women with promises of love, affection, and wealth, telling Vanessa that he wanted to be in her life and "build something" with her, and assuring the unidentified woman that he would always take care of her. As the relationships progressed, appellant began conditioning his affection on the victim engaging in

commercial sex work. This pattern was particularly evident with Bri, whom appellant insisted must engage in sex work for the relationship to continue. Eventually, two of the women, Bri and Luv Bug, assented to his demands. As shown by the text messages, appellant closely monitored them, collected the money they earned, and expected them to follow his directives.

Appellant's interactions with L. reflected the same modus operandi evident in his messages with the other victims. He promised L. affection, financial and emotional security, and the prospect of a relationship and a life together. She quickly developed a strong attachment to him and did not resist his initial suggestions to engage in commercial sex work. Over the following weeks, he leveraged her attachment to pressure her into taking more sex dates and participating in more invasive sex work, such as working on the blade.

Evidence of uncharged misconduct that is similar to the charged offenses is probative of intent because it "support[s] the inference that the defendant probably acted with the same intent in each instance." (*People v. Lindberg* (2008) 45 Cal.4th 1, 23; see *People v. Gallego* (1990) 52 Cal.3d 115, 171.) Given the striking similarity between appellant's inducement of other women to engage in commercial sex work and his interactions with L., the text messages provided compelling evidence that he also intended to induce and exploit L.

The messages were also highly probative to rebut the defense theory that appellant had no meaningful involvement in L.'s commercial sex work. As noted above, appellant testified that he sought only a romantic relationship with L., that engaging in commercial sex work was her idea, and that he derived no benefit from it. Evidence that appellant actively induced and exploited other women substantially undermined these claims. (See *People v. Clark* (2019) 43 Cal.App.5th 270, 290 [texts and social media showing defendant pandered other women rebutted claim he did not intend to pander victim].) Further, the messages revealed appellant had extensive knowledge of the business of

16.

commercial sex exploitation, which served to rebut appellant's suggestion that he played no active role in L.'s sex work. (*People v. Scally* (2015) 243 Cal.App.4th 285, 293 [texts to third parties showing defendant was "steeped in the pimping culture" rebutted the defense theory that the victim engaged in prostitution independently and he was merely a passive observer].)

Appellant argues the text messages lacked significant probative value because many of the exchanges occurred after the victim left appellant and returned to Bakersfield. However, he does not articulate how the timing of the uncharged acts diminished its relevance. It is well established that under Evidence Code section 1101, subdivision (b), evidence of uncharged misconduct is not limited to acts that occurred before the charged offenses, so long as the evidence is relevant to a noncharacter purpose for which it is admitted. (*People v. Balcom* (1994) 7 Cal.4th 414, 425–426; *People v. Garcia* (2001) 89 Cal.App.4th 1321, 1335.) That some of appellant's uncharged acts of pandering and exploitation occurred during the month after his interactions with L. did not undermine their probative value. Such evidence still supported the clear inference that appellant acted with the same intent toward L. and had extensive knowledge of the business and culture of sexual exploitation.

Appellant also contends the uncharged misconduct had minimal relevance because there was no evidence that any of the uncharged victims were minors. He notes that, despite this absence of evidence, the trial court found the uncharged misconduct and charged offenses "sufficiently similar" to warrant admission because both involved the exploitation and trafficking of minors.

We agree that the text messages do not conclusively establish whether the uncharged victims were over or under the age of 18. However, the precise ages of the uncharged victims were not material to trial court's ultimate basis for admitting the text messages. The uncharged acts evidence was relevant to appellant's intent because, like L., the uncharged victims were young women who were susceptible to his overtures and

17.

grooming, and appellant used the same methods to exploit their vulnerabilities and induce them to engage in commercial sex work. As the court observed, these similarities allowed appellant's communications with L. to be placed in context and were "tremendously probative" of his underlying intent. Whether any of the uncharged victims were under the age of 18 was inconsequential to this analysis.

With respect to the danger of undue prejudice, appellant contends the text messages were so voluminous and inflammatory that they overwhelmed the jury's ability to fairly decide the charged offenses without resorting to impermissible character inferences. He observes that the text messages extensively detailed uncharged misconduct involving multiple women, and points to specific inflammatory details, such as Luv Bug's complaint that appellant abandoned her in the cold, and appellant's attempt to induce Snowbunny to engage in sex work while pregnant.

We agree that the evidence of appellant's uncharged acts of pandering and human trafficking, and the specific messages referenced by appellant, were inherently inflammatory and carried some risk of prejudice. But when the evidence was admitted, the jury had already been exposed to extensive testimony and evidence that over the course of several weeks, appellant repeatedly exploited, abused, threatened, and assaulted L., a 16-year-old girl. Thus, the uncharged acts evidence was not uniquely inflammatory relative to the other evidence presented at trial.

We are also unpersuaded that the "sheer volume" of text messages invited the jury to draw an impermissible propensity inference. The messages were introduced through Detective Jones's testimony, occupying less than half of a court day. Although the messages spanned several hundred pages, each page contained only a handful of messages—mostly consisting of a single sentence or a few words. The uncharged acts evidence constituted only a small portion of a lengthy trial, and nothing in the record suggests its volume overwhelmed the jury's ability to fairly evaluate the totality of the evidence.

Appellant further claims that during closing argument the prosecutor exacerbated the prejudicial impact of the uncharged acts evidence by characterizing it as a "pattern" of trafficking other women. We disagree. In discussing the uncharged acts, the prosecutor emphasized that their similarity to the charged offenses demonstrated appellant's intent to induce L. to engage in commercial sex acts for his benefit. Nothing in the prosecutor's closing argument reasonably suggested that the jury should convict appellant based on bad character or a criminal disposition.

Finally, we recognize, as did the trial court, that the admission of uncharged acts inevitably carries some risk that jurors may misuse the evidence for an improper propensity inference. (See *People v. Johnson* (2022) 12 Cal.5th 544, 610; *People v. Thompson* (1988) 45 Cal.3d 86, 109.) To mitigate this risk, the court issued limiting instructions when the text messages were first introduced, again when they were referenced on cross-examination, and once more at the close of trial. The court expressly instructed the jury that the uncharged acts could not be considered as evidence of appellant's bad character or criminal disposition, but only for the limited purpose of evaluating his intent and knowledge in connection with the charged offenses. In the absence of evidence to the contrary, we presume the jury followed these limiting instructions. (*People v. Waidla* (2000) 22 Cal.4th 690, 725; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

In sum, the uncharged acts evidence was substantially probative, and the danger of undue prejudice was limited. We therefore conclude that the trial court's decision to admit the evidence was not " 'arbitrary, capricious and patently absurd.' " (*People v. Pineda, supra*, 13 Cal.5th at p. 222.) Accordingly, our review for an abuse of discretion reveals the trial court did not err, and we reject this claim.[6]

---

[6] Because we conclude the uncharged acts evidence was properly admitted, we necessarily reject appellant's claim that its admission violated due process. "The routine and proper application of state evidentiary law does not impinge on a defendant's due

19.

**II.    Substantial Evidence Supported the Jury's Finding that Appellant's Human Trafficking of a Minor Conviction Involved Force, Fear, or Other Coercive Means.  (§ 236.1, subd. (c)(2).)**

In addition to convicting appellant of human trafficking of a minor (§ 236.1, subd. (c)(1)), the jury found true the additional allegation that the offense "involve[d] force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person." (*Id*., subd. (c)(2).)  Appellant asserts that the evidence at trial was insufficient to sustain the finding.  While he concedes that "the record documents instances of physical and verbal altercations" between appellant and L., he claims there was no "causal and temporal nexus" between his coercive acts and the underlying offense.

### A.    *Standard of review*.

"To determine the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the prosecution to determine whether it contains [substantial] evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.)  We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)  "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*Tripp*, at p. 955, italics omitted.)

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.]  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]  Moreover, unless the testimony is physically impossible or inherently improbable,

process rights." (*People v. Riccardi* (2012) 54 Cal.4th 758, 809, abrogated on another ground by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

**B.** ***The jury's finding was supported by substantial evidence.***

Appellant contends that any evidence that he assaulted or threatened L. was not "causally or temporally" connected to the underlying offense of human trafficking. He asserts that L. voluntarily traveled to Sacramento to meet him and agreed to engage in commercial sex work without the threat of force or violence. According to appellant, to the extent the record reflects threats or assaults, those acts were merely "reactive responses to perceived transgressions rather than instrumental means of compelling commercial sex acts."

Appellant's claims are belied by the record. L. testified that while working for appellant, he repeatedly threatened and assaulted her whenever she refused to follow his directives. She specifically described one incident in which appellant "beat the shit out of [her]" after she told him she was too tired to work. Although she initially agreed to engage in commercial sex work out of a desire for love and a relationship, she explained that once appellant began physically assaulting her, her compliance was motivated by fear rather than affection. This testimony provided a clear basis for the jury to find that appellant's coercive conduct was directly tied to his demands that L. engage in commercial sex acts, establishing that the human trafficking offense involved force or fear.

The record also amply supported a finding that the human trafficking offense involved duress, defined as "a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to acquiesce in or perform an act which the person would otherwise not have submitted to or performed." (§ 236.1, subd. (h)(4); CALCRIM No. 3184.) After L. joined appellant in Sacramento, the evidence showed that he exercised pervasive control over every aspect of her life. Isolated from her family and only 16 years old, L. was entirely dependent on appellant

for money, food, and transportation.  As Detective Jones explained, this extreme imbalance of power, reinforced by the constant threat of violence for failing to comply with his directives, left L. with little practical alternative but to submit to appellant's demands that she continue engaging in commercial sex work.

In sum, our review of the record reveals compelling evidence that appellant induced L. to engage in commercial sex acts through violence, threats of violence, isolation from her family, and by exploiting her dependence on him for basic necessities. Substantial evidence therefore supported the jury's finding that the human trafficking offense involved force, fear, or other coercive means, and this claim fails.

## DISPOSITION

The judgment is affirmed.


                                                                LEVY, Acting P. J.
WE CONCUR:


FRANSON, J.


HARRELL, J.

22.